ALLSTATE INSURANCE
COMPANY, Plaintiff,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY, Dennis K. Cumpton, Linda Cumpton and Jeffrey Gourley, Defendants.

Civ. No. 85–2295.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

June 15, 1987.

---

**2.** In the maritime and pilotage context, this phrase means to offer or tender services.

Thomas B. Pryor, of Pryor, Barry, Smith and Karber, Fort Smith, Ark., for plaintiff.

Douglas O. Smith, Jr., of Warner and Smith, Fort Smith, Ark., for defendant U.S. Fidelity & Guar. Co.

Eddie N. Christian, of Christian & Beland, Fort Smith, Ark., for defendants Dennis K. Cumpton and Linda Cumpton.

William F. Smith, of Mobley and Smith, Russellville, Ark., for defendant Jeffrey Gourley.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### Introduction

This is a declaratory judgment action filed by Allstate Insurance Company against United States Fidelity and Guaranty Company, Dennis K. Cumpton and Linda Cumpton and Jeffrey Gourley. The court has jurisdiction by reason of diversity of citizenship and sufficient jurisdictional amount. 28 U.S.C. § 1332. The case was tried to the court on June 9, 1987.

### The Facts

Many of the facts are disputed, but the evidence proves, unequivocally, if nothing else, that young men often make incredibly bad choices, especially when drinking. The two young men who are the central figures in the issues before the court are Jeffrey Gourley, age 24, and Monty Sowell, age 23. They first met during the summer and early fall of 1983 when they were in the pledge class of Kappa Alpha Fraternity at Arkansas Tech University in Russellville, Arkansas. The evidence indicates that they became friends, although not particularly close ones, at that time and remained friends over the succeeding years. It appears that they both had automobiles for their personal use during that time, and Gourley claims that the pledgees sometimes used other pledgees' automobiles, especially to do work of the fraternity.

During the summer of 1984, after completing their first year of college, Sowell and Gourley lived in a house in Russellville with two other young men, Larry Bateman and Thomas Bowden, also Kappa Alpha

Fraternity members. Apparently Gourley already lived in the house when the other three young men moved in for the summer. In fact, the house was owned by one of the others, Thomas Bowden. According to the evidence, Gourley worked days at a local grocery store, and the other three men worked the night shift at a local processing plant that made pickles. Sowell and Bateman testified that because of the disparity in working hours, they seldom saw Gourley.

The credible evidence indicates that, while the young men lived together during the summer of 1984, Sowell had the 1981 Ford pickup (one of the vehicles covered by the insurance to be discussed below) and although at least his close friend, Larry Bateman, and perhaps others, sometimes used it, this was always done with Sowell's permission. Gourley seems to admit that. He testified that he used it on at least one occasion during that summer, but that he asked permission before doing so. He seems to think, or at least hopes the court will believe he thinks, that permission was not required because of his friendship with Sowell, but, nevertheless, he could recall no occasion on which he used the vehicle without Sowell's permission.

Before the 1984–85 school year, Sowell transferred to the University of Arkansas in Fayetteville, Arkansas, some 100 miles from Russellville. Gourley remained at Arkansas Tech. Shortly before Labor Day of 1985, Sowell transferred back to the Russellville school. Approximately one week before Labor Day of that year, he returned to Russellville.

Kappa Alpha Fraternity became involved in raising money for the Muscular Dystrophy Telethon to be held on Labor Day of 1985. The fraternity members collected money through various means and it was decided that, the day before Labor Day, they would "run" the money to Fort Smith to be delivered "on camera" during the telethon. Approximately the middle of the afternoon of the day before Labor Day, 15 to 18 members of the fraternity gathered to start the marathon run. They had several cars with them on the run (estimated by the witnesses to be from five to eight) and the practice apparently was for a member to run with the money for one mile and then ride in one of the vehicles while another member ran. At approximately 10:30 that night they made it to Charleston, Arkansas, approximately 20 miles from Fort Smith.

The members, which apparently still numbered somewhere between 15 and 18, then proceeded on to Fort Smith where the management of Kings Row Inn, a motel in Fort Smith, had provided them with two free rooms in which they were allowed to spend the night. The evidence indicates that the members had provided a keg of beer in at least one of the vehicles used on the trip, and it appears that after a member ran (and apparently sometimes before) that member imbibed. When the young men arrived at the Kings Row Inn, Gourley stayed in one of the rooms provided, and Sowell in the other. The keg of beer (or perhaps a substitute one) was available in the room occupied by Sowell.

It appears from the evidence that the young men, or at least most of them, continued to drink, at least to some extent, during the evening and at approximately midnight, or sometime shortly thereafter, Sowell went to bed and went to sleep, after obtaining from a local restaurant and eating a sandwich.

At some time during the evening, two young men who had ridden in Gourley's car apparently reminded him that he had indicated to them that he would return to Russellville. It appears at this time that young Gourley, for whatever reason, (probably because he was having a good time or thought he was) decided that he did not want to return. His friends reminded him that they had to return because they had jobs at which they had to appear the next morning. Gourley then gave to them the keys to his vehicle and told them to take it and return to Russellville.

The court believes that Gourley, as well as others, continued to drink during the evening, although Gourley, not surprisingly, says that he was not under the influ-

ence of alcohol and that he probably had "three, four or five beers."[1]

Sometime during the early morning hours, and it is not at all clear when, Gourley finds himself to be the only non-sleeping member of the group. He decides, for some unknown reason, to go somewhere, although it is not at all clear where. He said at the trial that he had decided to return to Russellville, but the night of the occurrence to be described below, he didn't seem to be sure where he was going. It also appears from the evidence that he not only did not know where he was going, he didn't know what time he left to go there. Shortly after the occurrence to be described below, and in a deposition given during the pretrial stages of this proceeding, he says that he left the motel at approximately 4:30 a.m. During the trial, when it became obvious that the accident in which he was involved occurred at approximately 7:02 in the morning, he decided that he must have left later because he is certain that he proceeded from the motel directly to the place where the accident occurred.

In any event, when he decided to leave to go wherever he was going, at whatever time he decided to go, because he did not have his own vehicle, he decided to use Sowell's pickup. There is a dispute about how he obtained the keys. Sowell testified, and this was supported by his friend, Bateman, that Sowell always locked his vehicle because it contained stereo equipment, tapes, speakers, and the like. Sowell said that at the time he went to bed, he locked his vehicle and laid the keys on a table in the room that he was occupying. Shortly after the accident, Gourley told an insurance investigator (Defendants' Ex. 1) that he got the keys either from the room or found them in the ignition. He now says that he has thought about that and he is certain that they were lying in the seat of the unlocked pickup. He admits that he did go to Sowell's room before leaving, but because he found him asleep, he said nothing to him.

Gourley testified that he left the motel, he now says to return to Russellville. He says that he intended to call Sowell the next morning to tell him where his pickup was. He apparently pulled onto the interstate highway near the motel and says that he believed that he was headed towards Russellville to the east on Interstate 40. After driving a short time, he saw a road sign indicating that he was nearing Sallisaw, Oklahoma, some 20 miles west of the Arkansas-Oklahoma line, and he realized that he was headed in the wrong direction. He turned around and started east on Interstate 40. Shortly after that, he came upon a vehicle owned and operated by the Cumptons, pulling a boat on a boat trailer. Shortly after the accident, he indicated that he probably went to sleep, but he now says that he simply didn't see the vehicle and boat. He ran into the back of it, doing substantial damage to the Cumpton vehicle and to the Sowell pickup that he was driving. The Cumptons claim that they were severely injured. The pickup that he was driving ended up off the road in the ditch. He then panicked and left the scene of the accident, leaving the damaged vehicles and allegedly injured persons in his wake. He ran to a nearby farm house and found a farmer's vehicle parked with the keys in it. He then, according to his testimony, "obtained possession" of that vehicle and drove it back to the Sheraton Inn, next door to the Kings Row Inn. He parked the vehicle that he had "obtained possession of" and went back to the room in which he was staying and showered. He then called his girl friend in Russellville who came to Fort Smith to pick him up. He did not tell anyone at the motel about the accident and did not advise Sowell that his pickup was sitting wrecked in the ditch somewhere on Interstate 40.

Young Gourley had a cut on his chin and was apparently otherwise bruised, and about 15 or 20 miles out of town, his girl friend insisted that he tell her what happened. When he did, she demanded that

---

1. Based on this court's experience as both a practicing lawyer and a judge, that estimate is more liberal than most. Most witnesses, under the circumstances, never seem to drink more than two beers.

they return to the Kings Row and tell Sowell what had occurred.

Several of the fraternity brothers then held a "conference" by the motel swimming pool about what to do. It is apparent that they were most concerned about protecting Gourley on the theft charge that could arise as a result of his "obtaining possession" of the farmer's pickup. They decided that the best thing to do was to have Sowell report his pickup as stolen. They were concerned that he had stashed the farmer's pickup so near their motel.

As planned by the fraternity brothers at the poolside meeting, Sowell reported his pickup as stolen. During the questioning of Sowell by a policeman about the incident, it appears that the policeman did not believe him. When he suggested that Sowell should probably be given a polygraph examination, Sowell decided to tell the truth and did.

The Cumptons filed suit against Sowell and Gourley in the Circuit Court of Crawford County, Arkansas, and prayed for actual damages of $50,000.00 and punitive damages of $25,000.00. After the lawsuit was filed, Gourley appeared at Sowell's home and advised him that he had an appointment with either an attorney or an insurance adjuster and that he had been advised that his (Gourley's) insurance carrier would not provide coverage unless Sowell would say that Gourley was driving Sowell's pickup with Sowell's permission and he asked Sowell to say that. Sowell declined to do so.

### The Insurance Policies

At the time of the accident there was in full force and effect an insurance policy issued by Allstate Insurance Company covering the Gourley automobile, showing Jeffrey Gourley as the named insured. It contains a standard omnibus clause providing coverage for the operation of a "non-

owned auto used by you or a resident relative with the owner's permission."

The Sowell pickup was covered by a policy of insurance issued by United States Fidelity and Guaranty Company to William C. Sowell, father of Monty Sowell. That policy is a so-called "plain language" policy, but, in the court's view, it is more difficult to understand than the policies written before some insurance carriers decided to make them easier to read. Rather than use the standard omnibus clause referred to above which is present in the Allstate policy, the drafter of the USF & G policy provided, in effect, that it would not provide coverage to a person "using a vehicle without a reasonable belief" that that person is entitled to do so.

During the pretrial stages of this matter, the court granted a motion for partial summary judgment, finding that, based on the provisions of the two policies, the USF & G policy was primary and the Allstate policy secondary. However, because of provisions in the policies, in the event that the USF & G policy does not cover the accident, the Allstate policy would become primary.

### Interpretation of USF & G Policy Provisions

Unlike the standard omnibus clause used in the Allstate policy which has been interpreted by the courts on numerous occasions, it appears that the "reasonable belief" provision of the USF & G policy has been before the courts very few times. Neither the attorneys for the parties nor the court and its staff were able to find any Arkansas cases or federal cases interpreting this provision. In fact, research indicates that this provision has been interpreted in any jurisdiction in the United States only nine times.[2]

The court believes that the first question that it must face and answer in construing this provision of the policy is

2. *Canadian Indem. Co. v. Heflin,* 151 Ariz. 257, 727 P.2d 35 (1986); *Roberts v. United States Fidelity and Guar.,* 498 So.2d 1037 (Fla.App. 1986); *Georgia Farm Bureau Mut. v. Fire & Cas. Ins.,* 180 Ga.App. 777, 350 S.E.2d 325 (1986); *Nationwide Mut. Ins. v. Southern Trust Ins.,* 174 Ga.App. 513, 330 S.E.2d 443 (1985); *State Auto.*

*Mut. Ins. Co. v. Ellis,* 700 S.W.2d 801 (Ky.App. 1985); *Francois v. Ybarzabal,* 469 So.2d 1001 (La.App.1985); *McGuire v. Hartford Ins. Co.,* No. L–86–073, slip op. (Ohio App. Aug. 29, 1986); *Donegal Mut. Ins. Co. v. Eyler,* 519 A.2d 1005 (Pa.Super.1987); *Safeco Ins. Co. of America v. Davis,* 44 Wash.App. 161, 721 P.2d 550 (1986).

whether the provision is ambiguous, because, if it is, the law is well settled that the provision will be construed against the insurance company that drafted it. *Aetna Cas. & Sur. Co. v. Stover*, 327 F.2d 288 (8th Cir.1964); *Reiter v. State Farm Mut. Auto. Ins. Co.*, 357 F.Supp. 1006 (E.D.Ark. 1973); *Countryside Cas. Co. v. Grant*, 269 Ark. 526, 601 S.W.2d 875 (1980). *See also* the discussion and cases cited at 43 Am. Jur.2d *Insurance* § 283.

On the other hand, if the court deems the provision to be plain and unambiguous, the law is that the court will not use a forced construction of the terms of an insurance contract where no ambiguity exists, and must apply the law to the unambiguous terms. *Benton State Bank v. Hartford Acc. & Indem. Co.*, 452 F.2d 5 (8th Cir. 1971); *Peacock & Peacock, Inc. v. Stuyvesant Ins. Co.*, 332 F.2d 499 (8th Cir.1964); *Hardware Dealers Mutual Fire Ins. Co. v. Holcomb*, 302 F.Supp. 286 (W.D.Ark.1969); *Southern Farm Bureau Cas. Ins. Co. v. Williams*, 260 Ark. 659, 543 S.W.2d 467 (1976); and *Arkansas Blue Cross-Blue Shield, Inc. v. Tompkins*, 256 Ark. 370, 507 S.W.2d 509 (1974).

As the Arkansas Supreme Court said in *Rogers v. State Farm Ins. Co.*, 243 Ark. 887, 422 S.W.2d 677 (1968):

We recognize the distinction between the construction to be placed on an omnibus clause extending the coverage of an insurance policy and an exclusionary clause limiting or excluding coverage under a policy. We also recognize the modern trend to broaden coverage under omnibus clauses of insurance contracts, (*Industrial Indemnity Co. v. Continental Casualty Co.*, 375 F.2d 183 (10th Cir. 1967)), but liberal construction should not extend coverage under an omnibus clause, or restrict it under an exclusionary clause, beyond the plain words and obvious intent and meaning of the words used in the contract.

As indicated, there are few cases to aid the court in interpreting this "plain language" used by USF & G in its policy. However, the court recognizes that the pol-

icy of insurance is nothing more than a contract between the insurance carrier and its insured, and is to be governed by the ordinary rules of interpretation of contracts. *Couch on Insurance* § 45:294 at 620, and *Perkins v. Clinton State Bank*, 593 F.2d 327 (8th Cir.1979). A common sense approach should be used, and generally the words employed in the policy are to be understood in their ordinary sense. *Wommack v. United States Fire Ins. Co.*, 323 F.Supp. 981 (W.D.Ark.1971).

Using these principles, the court finds that the words "using a vehicle without a reasonable belief that the person is entitled to do so" have a plain and unambiguous meaning. This provision means that, in order for there to be coverage, the trier of fact must find that the person using the vehicle believed that he was entitled to do so and that such belief was reasonable. As the Court of Appeals of Georgia said in *Nationwide Mut. Ins. Co. v. Southern Trust Ins. Co., et al.*, 330 S.E.2d 443 (Ga. App.1985):

The use of the term 'reasonable belief' in the exclusionary clause provides an objective standard by which the trier of fact may determine the substance of a claimant's action. From the language of the clause it is clear that coverage is excluded if the driver (a) knew he was not entitled to drive the vehicle, or (b) if he claimed he believed he was entitled to drive the vehicle, but was without reasonable grounds for such belief or claim.

It is true that other state courts have held that this provision of the "plain language" policy is ambiguous and have found that there is coverage under the facts of those cases.[3] However, the court believes that these cases can be distinguished on their facts. In each of these cases, the driver operating the insured vehicle at the time of the accident was under age and, under the law of the state of his residence, was not permitted to drive. The insurance carriers contended that, irrespective of what the driver's state of mind may have been in relation to whether he had the

---

**3.** *State Automobile Mut. Ins. Co. v. Ellis, supra,* and *Canadian Indem. Co. v. Heflin, supra.*

permission of the owner of the vehicle to drive it, coverage is still excluded because he was not "entitled" to drive under state law. These two state courts, in effect, held that if the insurance carriers intended the clause to so provide, they should have said so. Both courts held that there was coverage.

This court is convinced that it is its duty, as the trier of fact in this case, to determine not only whether young Jeffrey Gourley believed that he was entitled (had permission) to drive the Sowell vehicle, but whether that belief was reasonable. From the evidence in the case, the court is not at all convinced that Jeff even believed that he was permitted to drive the Sowell vehicle when he took it. In fact, based on the evidence, the court wonders if Mr. Gourley had "any belief" at all at the time. It is obvious that he wasn't sure the night of the accident where he intended to go in the vehicle or what time he left to go there. Although he denied being under the influence of alcohol, the court concludes that his actions indicate that there is no other credible explanation for his actions. In fact, Mr. Gourley did not say during his testimony that he believed that he had permission or believed that he was entitled to drive the vehicle. Instead, he contended that he did not think that his friend, Sowell, would mind if he took the vehicle in the middle of the night after he had consumed "three, four or five beers," and drove it some 80 miles to Russellville, Arkansas, without the owner's consent.

Even if Mr. Gourley believed that he was "entitled" to drive the vehicle at the time that he took it, the court finds, without question, that such belief was not reasonable. It must be remembered that there is no evidence to indicate that anyone had ever used the Sowell vehicle without at least asking him for permission. Gourley did not testify that he had ever used it without doing so, or that any other person had. On the marathon run, the evidence indicates that Sowell's good friend, Larry Bateman, drove the vehicle. In the court's view, there is no evidence of any relationship between Gourley and Sowell, or any actions on the part of Sowell, either on the day of the accident or prior to that time, which would cause a reasonable person to believe that he was entitled to take the Sowell vehicle, in the middle of the night, after drinking all day, to return 80 miles to Russellville, Arkansas, leaving Sowell, without his knowledge, without a vehicle in which to return to his home. Such conduct is not reasonable, and the court is convinced that Mr. Gourley would not have believed that it was, and would not have taken the action that he did without the influence of the "three, four or five beers" that he admits that he had prior to the occurrence.

The court finds that at the time of the accident, Gourley was using the Sowell vehicle "without a reasonable belief" that he was "entitled to do so." For this reason, Exclusion A.8. of the United States Fidelity and Guaranty policy issued on the Sowell vehicle excludes coverage.

### Interpretation of Allstate Policy Provisions

The standard to be applied in determining whether there is coverage under the Allstate policy is substantially different than the standard discussed above. As indicated, the USF & G policy focuses on the "reasonable belief" of the person operating the vehicle. Under the provision of the Allstate policy, the belief of the operator is immaterial. Instead, the sole question to be determined is whether the vehicle was operated at the time "with the owner's permission." This, to some degree at least, is a considerably more objective standard and one which, in this court's view, is easier to apply. The owner of the Sowell vehicle was not young Monty but his father, W.C. Sowell. Thus, the question becomes whether Gourley, at the time that he operated the pickup, had the permission of W.C. Sowell.

As this court held in *Allstate Ins. Co. v. Johnson*, 539 F.Supp. 421 (W.D.Ark.1982), the provision of the Allstate omnibus clause is plain and unambiguous, and the court must apply the law to unambiguous terms of a policy.

During his many years as the only United States District Judge for the Western District of Arkansas, the Honorable John E. Miller on a number of occasions construed the standard omnibus provision which the Allstate policy contains. *Farmers Ins. Exchange v. Andrews*, 345 F.Supp. 689 (W.D.Ark.1972); *St. Paul Fire & Marine Ins. Co. v. Dean*, 308 F.Supp. 1378 (W.D.Ark.1970); *MFA Mut. Ins. Co. v. Mullin*, 156 F.Supp. 445 (W.D.Ark.1957); and *Dodson v. Sisco*, 134 F.Supp. 313 (W.D.Ark.1955). In *Dodson, supra*, Judge Miller was first faced with this question before it had been decided by the courts of Arkansas. Applying what he believed to be Arkansas law, he set forth a number of tests that should be considered in determining whether the driver of the vehicle had either the expressed or implied permission of the owner to operate the vehicle. The passage of time did not indicate that Judge Miller's prediction was incorrect, and he applied these principles in some or all of the other cases decided by him cited above.

▮▮ Applying these principles to this case, the court finds that there is no basis to conclude that W.C. Sowell, the owner of the Sowell vehicle, either expressly or impliedly, authorized anyone other than his son to use the vehicle. His mere permission to his son to operate the automobile does not, of itself, authorize the son to delegate this right to a third person. *St. Paul Fire & Marine Ins. Co. v. Dean, supra*. It is true that the facts surrounding the owner granting permission to the first permittee may indicate that he has impliedly also granted him permission to loan the automobile to a third person. The cases hold that all aspects of the circumstances surrounding the granting of permission to the first permittee must be taken into account into resolving the question of "implied permission." Permission may be implied from all the facts and circumstances surrounding the parties and may result by implication from the relationship of the parties. *Stoll v. Hawkeye Cas. Co.*, 193 F.2d 255 (8th Cir.1952); *Hawkeye Cas. Co. v. Rose*, 181 F.2d 157 (8th Cir.1950); and *Traders & General Ins. Co. v. Powell*, 177 F.2d 660 (8th Cir.1949). The issue of whether an automobile is being operated with permission, express or implied, is in most instances a question of fact. *Bekaert v. State Farm Mut. Auto Ins. Co.*, 230 F.2d 127 (8th Cir.1956); *Powell, supra;* and *Home Indemnity Co. v. Ray,* 235 Ark. 540, 361 S.W.2d 24 (1962).

In this case, there is absolutely no evidence from which this court can even infer that Monty Sowell granted Gourley permission to use the automobile and, in fact, Gourley does not even contend that he did. Instead, he seems to believe, or at least says he does, that Monty "wouldn't care." The evidence indicates that at least on the night of the accident, in the condition that he apparently was in, Mr. Gourley did not seem to be too discriminating in whose vehicle he took or whether he had any right to do so. He not only took the Sowell vehicle, but also one of a farmer that he found parked in the farmer's driveway.

Since there is absolutely no evidence that Monty Sowell gave Gourley permission to use the automobile, it is not necessary to determine from the facts whether Monty's father, W.C. Sowell, impliedly authorized him to give such permission. The owner of the vehicle, W.C. Sowell, who was not even there, certainly didn't give Gourley permission to use the vehicle, and the evidence is clear that neither did Monty. In order for the court to find that Gourley had the owner's permission to drive the vehicle, it would be necessary to find from the facts that W.C. Sowell impliedly granted his son permission to impliedly grant others permission to use the automobile without asking. No rational interpretation of the evidence would warrant that.

Thus, it is uncontroverted that, at the time that he took the Sowell pickup, Jeff Gourley did not have the owner's permission, either express or implied. For this reason, the Allstate policy simply provides no coverage for the accident which resulted in the lawsuit by the Cumptons in state court.

### Conclusion

The court finds that neither of the insurance companies which are parties to this

action owe defendant, Jeffrey Gourley, any duty to defend the lawsuit which was filed by the Cumptons in the Circuit Court of Crawford County, Arkansas, or any other lawsuit filed by them as a result of the accident which occurred on September 2, 1985, at the time and place described in the state court complaint which was attached to plaintiff's petition for declaratory judgment, nor any duty to pay any judgment rendered in that action or any other action resulting from such accident.

A separate judgment will be rendered in compliance with this opinion.