The CONNECTICUT INDEMNITY
COMPANY, Plaintiff,

v.

HARRIS TRANSPORT COMPANY, Mitchell Hogan, Ralph C. Hogan, Vanliner Insurance Company, and Dorothy Ella (Dot) Thomas, Personal Representative of the Estate of Kenneth Thomas, Deceased, Defendants.

No. 95–2094.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Nov. 6, 1995.

David B. Vandergriff, Ft. Smith, AR, for Connecticut Indemnity Company.

Robert L. Jones, III, Robert L. Jones, Jr., Jones, Jackson & Moll, Fort Smith, AR, for Harris Transport Company, Vanliner Insurance Company.

J. Ray Baxter, Baxter, Wallace and Jensen, Daniel B. Thrailkill, Page & Thrailkill, Mena, AR, for Dorothy Ella Thomas.

### MEMORANDUM ORDER AND JUDGMENT RE MOTION FOR SUMMARY JUDGMENT

HENDREN, District Judge.

NOW on this 6th day of November, 1995, comes on for consideration the cross motions for summary judgment filed herein by the parties and the Court, being well and sufficiently advised, finds and orders as follows:

### BACKGROUND

This case is before the Court for declaratory judgment concerning the respective rights and responsibilities of the parties in connection with a fatal vehicular accident which occurred on April 3, 1995, on U.S. Highway 71 in Polk County, Arkansas. Kenneth Thomas was killed in the accident when the vehicle he was operating collided, head-on, with a semi-trailer truck operated by Ralph Hogan. At the time of the accident, the semi-trailer truck was owned by Mitchell Hogan, brother of Ralph, and was leased to Harris Transport Co. (Harris). At the time of the accident, two (2) liability insurance policies were in force with respect to the semi-trailer truck. Vanliner Insurance Co. (Vanliner) had issued its policy (the Vanliner Policy) to Harris as lessee of the semi-trailer truck, and Connecticut Indemnity Company (CIC) had issued its policy (the CIC Policy) to Mitchell Hogan, as owner of the semi-trailer truck. As a result of the accident, Dorothy Ella (Dot) Thomas (Thomas), the personal representative of the Estate of Kenneth Thomas, filed a lawsuit against the Hogans and Harris seeking, *inter alia,* damages as a result of the death of Kenneth Thomas. That suit will be hereinafter referred to as the "underlying tort lawsuit."

The action presently before the Court relates to the rights and responsibilities of the various parties in connection with the underlying tort lawsuit. The Court is asked to declare, by way of declaratory judgment, whether Vanliner or CIC, or both of them, are obliged to defend the Hogans and/or Harris in the underlying tort lawsuit and to pay any judgment which Thomas might therein secure by reason of the respective provisions of the Vanliner Policy and the CIC Policy. Further, Thomas asks the Court to declare that Harris, as a matter of law, is responsible to Thomas for any damages which may ultimately be proven in the underlying tort lawsuit.

CIC and Thomas both filed their motions for summary judgment contending that there were no material facts in dispute and that, based on the undisputed facts, the Court should find, as a matter of law (1) that CIC has no duty, under the CIC Policy, to defend the Hogans or Harris in the underlying tort lawsuit nor to pay any judgment which Thomas might secure therein against them; (2) that Vanliner does have a duty, under the Vanliner Policy, to defend the Hogans and/or Harris in the underlying tort lawsuit and to pay any judgment which Thomas might secure therein against them; and (3) that Harris is liable, as a matter of law, to Thomas for any damages which might be proven by Thomas in the underlying tort lawsuit.

After first contending there *were* material facts in dispute, Harris and Vanliner subsequently agreed with CIC and Thomas that there were not and filed their Motions for Summary Judgment. In their motions, Harris and Vanliner say that, based on the undisputed facts, the Court should declare, as a matter of law, (1) that Vanliner has no duty, under the Vanliner Policy, to defend Hogans and Harris in the underlying tort lawsuit nor to pay any judgment which may be secured by Thomas therein against them; (2) that CIC has the duty, under the CIC Policy, to defend Hogans and Harris in the underlying tort lawsuit and to pay any judgment which may be secured by Thomas therein against them; and/or (3) that, in the alternative, both CIC and Vanliner, by reason of their respective policies, have the duty to defend the Hogans and Harris in the underlying tort lawsuit and to pay, pro-rata, any judgment which may be secured by Thomas therein against them.

The parties have agreed what constitutes the material facts in this case and have stipulated to them.

### Standard for Determining Summary Judgment

1. When examining a motion for summary judgment, the Court first looks to the

provisions of Fed.R.Civ.P. 56(e), which provides:

... When a motion for summary judgment is made and·supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

It is also appropriate for the Court to consider its Local Rule C–10(b) and (c) which provides:

(b) If the non-moving party opposes the motion, it shall file, in addition to any response and brief, a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried.

(c) All material facts set forth in the statement filed by the moving party pursuant to paragraph (a) shall be deemed admitted unless controverted by the statement filed by the non-moving party under paragraph (b).

■ The Court's function at the summary judgment stage is not to weigh the evidence, but to determine "whether the record, when viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Langley v. Allstate Insurance Co.*, 995 F.2d 841, 844 (8th Cir.1993). "To survive a motion for summary judgment, the non-moving party need only show sufficient evidence that supports a material factual dispute that would require resolution by a trier of fact." *Id.*

'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.... Only disputes over facts that might affect the outcome of the suit under the governing law will prop-

erly preclude the entry of summary judgment.'

*Id.* at 844, quoting from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). (Emphasis in original).

■ Where the party against whom summary judgment is sought has the ultimate burden of proof, the party seeking summary judgment can show his entitlement to summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). After a movant does this, the burden shifts to the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553, quoting Fed.R.Civ.P. 56(e). If the non-moving party fails to do this, then the moving party is entitled to summary judgment.

■ In evaluating evidence submitted in support of and in opposition to a motion for summary judgment, the question is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## AGREED STATEMENT OF MATERIAL UNCONTESTED FACTS

2. All of the parties to this action have submitted with their respective Motions for Summary Judgment an Agreed Statement of Material Uncontested Facts in accordance with Rule C–10 of the Rules of the United States District Court for the Eastern and Western Districts of Arkansas. The parties have agreed that this Agreed Statement supersedes and replaces each statement of material uncontested facts previously submitted by any party. Accordingly, the Court accepts the Agreed Statement of Material Uncontested Facts, which are as follows:

(a) Connecticut Indemnity Co. ("CIC") is a corporation authorized and existing under

the laws of the State of Connecticut for the purpose of providing insurance to members of the general public. Its principal place of business is in Farmington, Connecticut. Defendant Harris Transport Company ("Harris") is a corporation authorized and existing under the laws of the State of North Carolina. Its principal place of business is in Monroe, North Carolina. Defendant Vanliner Insurance Company ("Vanliner") is a corporation authorized and existing under the laws of the State of Arizona for the purpose of providing insurance coverage to members of the general public. Its principal place of business is in Fenton, Missouri. Defendants Mitchell Hogan and Ralph C. Hogan are individual citizens and residents of the State of Louisiana. Defendant Dorothy Ella "Dot" Thomas is the duly appointed personal representative of the estate of Kenneth Thomas, having been so appointed by the Probate Court of Polk County, Arkansas. She is a citizen and resident of Polk County, Arkansas, as was Kenneth Thomas at the time of his death.

(b) Prior to the time of the occurrence herein described, CIC issued and delivered to Mitchell Hogan a certificate of non-trucking automobile liability insurance (Tab 1) under its commercial lines insurance policy No. BA 45 36 76 (Tab 2). The certificate described Mitchell Hogan as one of several named insureds (specified owner/operators) and extended the coverage described in said policy and the attached endorsements, with limits of $500,000.00. Mitchell Hogan paid $70.00 for said coverage, representing two month's premiums @ $35.00 per month.

(c) Prior to the time of the occurrence herein described, Vanliner issued and delivered to Harris its business automobile liability insurance policy number BA01008100–00 (Tab 3). The policy was in effect from August 1, 1994 through August 1, 1995, described Harris as a named insured and extended automobile liability coverage to Harris, with limits of $1,000,000.00. Harris paid $352,350.00 for said coverage. Although Harris does not own any trucks itself, it leases between one hundred fifty (150) and one hundred sixty (160) trucks at any given time, and this policy covers all of the trucks leased to Harris.

(d) Harris is an interstate motor carrier of freight for hire, operating under authority issued by the Interstate Commerce Commission (the "ICC") pursuant to the Carmack Amendment to the Interstate Commerce Act. The policy of insurance issued by Vanliner to Harris was issued, among other reasons, for the purpose of compliance with 49 C.F.R. § 1043.1(a), which requires interstate motor carriers to carry liability insurance for the benefit and protection of the general public. Vanliner filed a certification of insurance form with the ICC to document said compliance.

(e) At all times herein material Mitchell Hogan was the owner of a 1987 Ford truck tractor and a flat bed semi-trailer. On March 3, 1995 Mitchell Hogan entered into a written lease agreement (Equipment Operating Contract) (Tab 4) with Harris, whereby Harris, as Lessee, operated said tractor/trailer pursuant to Harris' ICC authority. ICC regulations (49 C.F.R. § 1057.12(c)) required said lease to contain a provision requiring Harris to maintain exclusive possession, control and use of the tractor/trailer and to assume complete responsibility for the operation of the equipment for the duration of the lease. Harris and Vanliner have acknowledged that the lease complies with all applicable ICC regulations.

(f) At all times herein material, Jackie Lewis, 210 Threatt Street, Eunice, Louisiana ("Lewis"), was an agent (Tab 5) of Harris for the purpose of procuring freight to be transported under Harris' ICC authority by owner/operators under lease to Harris. Jackie Lewis also handled all of the paperwork and communications between Harris and Mitchell Hogan, Ralph Hogan and Charlie Hogan when the three of them applied for leases with Harris. No other person affiliated with Harris communicated directly with any of the Hogans.

(g) During the week of March 31, 1995, Lewis located three loads of freight at Southern Structures, Inc. in Youngsville, Louisiana. Lewis called Bob Turner, Harris' dispatcher in Monroe, North Carolina, on March 31, 1995 and told Turner that he had

three loads of freight and that he would deliver one load, Mitchell Hogan would deliver one load and Charlie Hogan would deliver one load. Bob Turner gave Jackie Lewis a Harris' authorization number or "pro number" for each load (Tab 6). Jackie Lewis and Charlie Hogan also leased their equipment to Harris pursuant to a written Equipment Operating Contracts.

(h) Mitchell Hogan had to be in Louisiana and could not drive his truck to Rogers, Arkansas. He asked his father to drive his truck for him and his father agreed to drive as a favor to Mitchell Hogan. Mitchell Hogan's truck was parked at Ralph Hogan's house when Ralph Hogan left on the trip on Sunday morning, April 2, and Ralph Hogan was planning on returning Mitchell Hogan's truck to Ralph Hogan's house at the conclusion of the trip.

(i) Two long distance telephone calls were made from Jackie Lewis' residence to Ralph Hogans residence on March 31 and two were made on April 1 (Tab 7).

(j) All three trucks left the Lafayette, Louisiana area on Sunday morning, April 2, 1995, with freight consigned from Southern Structures, Inc. to Conark Building Company in Rogers, Arkansas. Jackie Lewis was instructed by Southern Structures, Inc. to deliver the freight on Monday morning, April 3. Jackie Lewis was the first to arrive at the truck stop and Charlie Hogan and Ralph Hogan met him there shortly thereafter. Jackie Lewis was driving his own truck, Charlie Hogan was driving his own truck, and Ralph Hogan was driving Mitchell Hogan's truck, with Mitchell Hogan's permission. The three trucks left the truck stop in Natchitoches and drove to Texarkana, where they took Highway 71 North to Y City, Arkansas. All three drivers ate together at a truck stop at Y City, Arkansas at 2:30 or 3:00 o'clock in the afternoon. They then drove up Highway 71 to Rogers, Arkansas where they parked together and spent the night, sleeping in the cabs of their trucks. They drove to Conark Building Co.'s construction site in Rogers, Arkansas at approximately 7:00 a.m. on Monday morning, April 3. It was necessary that the trucks be there at that approximate hour because Conark Building Company had to arrange for equipment to unload the trucks.

(k) After delivering all three loads, the three tractor/trailers left Rogers, Arkansas to return home, empty. Neither Mitchell Hogan nor Jackie Lewis had ever hauled or backhauled any freight for any other carrier other than Harris during the entire time they were leased to Harris. They were travelling together, with Jackie Lewis in front, Charlie Hogan in the middle and Ralph Hogan in back. They were following the same route on the return trip that they had taken going to Rogers when the tractor/trailer being driven by Ralph Hogan was involved in an accident on Highway 71 in Polk County, Arkansas. The driver of the other vehicle involved in the accident, Kenneth W. Thomas, P.O. Box 174, Grannis, Arkansas, was killed.

(1) The logs (Tab 8) and bills of lading (Tab 9) for the trip for all three trucks were turned in to Harris. Harris billed Southern Structures for the loads delivered by Jackie Hogan and Charlie Hogan, but did not bill for the load delivered by Ralph Hogan (Tab 10). Harris paid no compensation to either Ralph Hogan or Mitchell Hogan.

(m) Connecticut's policy included the following language (Tab 11):

"WHO IS AN INSURED"

The following are "insureds":

a. You for any covered "auto".

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except: (exceptions not applicable).

Connecticut's Group policy also included a commercial auto endorsement (Tab 12), No. CA 23 09 12 93, which provided, in relevant part:

"LIABILITY COVERAGE for a covered "auto" described in the Schedule is changed as follows:

1. The following exclusions are added: This insurance does not apply to:

a. A covered "auto" while used to carry property in any business.

b. A covered "auto" while in the business of anyone to whom the "auto" is rented.

2. WHO IS AN INSURED does not include anyone engaged in the business of transporting property by "auto" for hire who is liable for your conduct."

(n) The individual certificate of insurance (Tab 1) issued to Mitchell Hogan under the group policy contained the following language:

No coverage is afforded when the described vehicle(s) is (are):

1. Under motor carrier direction, control, or dispatch.

2. Used to carry property in any business or in route for such purpose.

3. While being operated or used in any racing or speed contest.

4. Leased without an operator.

5. When permanent lease with certificate holder has terminated.

(o) The Vanliner policy contains a truckers' endorsement form in 7 pages (Tab 13) (Endorsement No. CA 23 20). The trucking operations liability coverage is described at pp. 003–004 of the endorsement, as follows:

For any operations you engage in as a "trucker" the policy is changed as follows:

A. Who is an insured under liability coverage is replaced by the following:

1. Who is an insured

A. You for any covered "auto."

B. Anyone else while using with your permission a covered "auto" you own, hire or borrow except: [exceptions not applicable]

C. The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" is connected to another covered "auto" that is a power unit ...

D. The owner or anyone else from whom you hire or borrow a covered "auto" that is not a "trailer" while the covered "auto":

(1) is being used exclusively in your business as a "trucker"; and

(2) is being used pursuant to operating rights granted to you by a public authority.

E. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

The Vanliner policy also included an endorsement (Tab 14), No. MCS–90, which provided, in relevant part:

... the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in operation, maintenance or use of motor vehicles subject to the financial requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.... It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from payment of any final judgment....

(p) At the time of the accident, Harris' logo and ICC permit number were on the door of the tractor. Jackie Lewis knew that Ralph Hogan was driving the vehicle at least one day before the accident but never notified Harris until after the accident occurred.

(q) In January and February of 1995 Ralph Hogan sent information to Harris through Jackie Lewis for the purpose of leasing his equipment to Harris. Harris declined to enter into an owner/operator lease with Ralph Hogan on both of those occasions because of Ralph Hogan's driving record (Tab 15).

(r) Harris terminated the leases of Mitchell Hogan and Jackie Lewis on April 4, 1995 and terminated its agency relationship with Jackie Lewis on the same day. Harris gave Jackie Lewis written notification of the termination of his leases by letter dated April 7, 1995 (Tab 16).

(s) On September 13, 1995, Dorothy Ella (Dot) Thomas, in her capacity as personal representative of the estate of Kenneth Thomas, deceased, filed a complaint (Tab 17)

in this court (Case No. 95–2171) against Harris, Mitchell Hogan and Ralph Hogan seeking damages for the wrongful death of Kenneth Thomas.

(t) After the accident, Pfc. Mickey Helms of the Arkansas State Police inspected the vehicle that Ralph Hogan was driving and filled out an inspection report (Tab 18).

## DISCUSSION

3. There are several issues which must be decided in this case, among which are:

(a) Does Vanliner have coverage for Harris?

(b) Does Vanliner have coverage for Ralph Hogan and/or Mitchell Hogan?

(c) Does CIC have coverage for Harris?

(d) Does CIC have coverage for Ralph Hogan and/or Mitchell Hogan?

(e) If both Vanliner and CIC have coverage, which is primary?

■ 4. *Vanliner Coverage for Harris*— Vanliner concedes that it is obligated to pay any final judgment recovered against Harris in the underlying lawsuit. [Harris/Vanliner Brief (Document #33), at page 13]. It is assumed that Vanliner's concession relating to its obligations to Harris is based upon the "Logo Liability Rule" recognized in *Grinnell Mutual Reinsurance Co. v. Empire Fire & Marine Ins. Co.*, 722 F.2d 1400, 1404 (8th Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); and *Acceptance Ins. Co. v. Canter*, 927 F.2d 1026 (8th Cir.1991). Under that rule, it is held that the lessee of a truck being operated under a carrier lease agreement meeting the requirements of 49 C.F.R. § 1057.12, is *statutorily* liable for damages occasioned by the negligent operation of that truck. Proof that, at the time of an accident, the lessee's ICC number and logo are displayed on the truck is usually sufficient to establish this liability.

This concession is a bit puzzling in light of Vanliner's (and Harris') continuing insistences that (a) Ralph Hogan was not an employee of Harris and was not authorized to operate the truck; and (2) that the truck was not, at the time of the accident, "on the business" of Harris. Notwithstanding the text of the statutes upon which the "Logo Liability Rule" is based, it seems obvious that Harris can have no liability unless there was negligence or fault on the part of the operator of the truck at the time of the accident—and that is something which still must be proven by the plaintiff in the underlying tort lawsuit. It therefore seems that Vanliner/Harris concede the proposition that the "Logo Liability Rule" imposes statutory liability on Harris by reason of any negligence occurring in the operation of the truck without regard to who was operating it or whether the operator had proper authority.

5. The remaining issues essentially turn on two (2) basic fact questions: (1) Was Ralph Hogan driving the truck with the permission of Harris at the time of the accident?; and (2) was the truck being operated "in the business of" Harris at the time of the accident?

■ 6. *Did Ralph Hogan have Harris' permission to drive?*—Vanliner argues that its policy provides no coverage for Ralph Hogan since he was not a certified driver and, therefore, Mitchell Hogan had no authority to permit him to be driving the truck when the accident occurred. Therefore, says Vanliner, Ralph Hogan was not driving the truck with the permission of Harris at the time of the accident and there is no coverage for him under the Vanliner policy (which is a contract) since the policy specifically provides coverage only if the operator has the permission of the named insured (Harris) at the time of any accident.

Plaintiff and CIC argue that it is irrelevant as to whether Ralph Hogan had Harris' permission to operate the truck since the "Logo Liability Rule" statutorily imposes liability on Harris for the negligence of the operator of its leased truck.

Vanliner and Harris counter by arguing that the statutory liability does not extend that far under the circumstances of this case.

The "Logo Liability Rule" was invoked in *Canter* to conclude that the carrier lessee was liable for the negligence of the leased truck's driver "because [the driver] was driv-

ing under [the carrier lessee's] logo with its consent when the accident occurred." Thus, in connection with the imposition of the "Logo Liability Rule," there was no issue in that case as to whether the driver was authorized or had permission to be driving the truck at the time of the accident. There is such an issue in this case.

While the statute, as interpreted by various Courts, requires the lessee to be liable to parties injured by the operation of a leased truck bearing its ICC number and logo, the Court perceives nothing in it which requires the lessee to be responsible for the defense of the operator of the truck or for the payment of any judgment which might be obtained against the operator, individually. The relevant statute does not require the lessee to provide liability insurance coverage for the operators of its leased trucks.

> The relevant ICC regulation on insurance, 49 C.F.R. § 1043, contains no provision which would require a motor carrier specifically to carry insurance affording liability coverage for judgments rendered solely against an owner-operator of a vehicle leased to the motor carrier.

*Wellman v. Liberty Mutual Ins. Co.,* 496 F.2d 131, 138 (8th Cir.1974).

Plaintiff and CIC argue that the statutory liability is absolute—and that Harris is thereby liable for *all* damages which may be proven in the underlying tort lawsuit. While that argument is no doubt based upon language used by Courts discussing the rational and import of the "Logo Liability Rule," no case has been found in which any Court has precisely so held on facts indistinguishably similar to those in the case at bar. Thus, if it is to be held that Harris and/or Vanliner should defend either of the Hogans and/or pay any judgment which the plaintiff might obtain against them, as individuals, those obligations will have to be found either in contract or by common law. *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* supra.

Paragraph 5 of the Equipment Leasing Contract (under the heading of "Special Terms and Conditions"), provided:

> 5. The CONTRACTOR recognizes that CARRIER'S business of providing motor carrier transportation services to the public is subject to regulation by the Federal government acting through the Interstate Commerce Commission and that the form of the Contract is governed by 49 CFR part 1057 and Ex Parte MC 43 the Department of Transportation, and by various state and local governments. The CONTRACTOR shall have the responsibility to the CARRIER of satisfying these regulatory requirements, subject at all times to verification by the CARRIER, by:
>
> \*   \*   \*   \*   \*   \*
>
> C. Hiring to operate the Equipment only such drivers who have been verified by the Carrier as being qualified under the applicable regulations; CARRIER may immediately terminate this Contract with CONTRACTOR if a violation occurs.

[Agreed Fact #2(e)].

The Vanliner Policy provides, in pertinent part, that coverage will be extended to "anyone else while using *with your permission* a covered "auto" you own, *hire* or borrow ..." [Agreed Fact #2(o)A(1)(B)]. (Emphasis added).

It thus appears that Harris gave permission to Mitchell Hogan to hire operators of the leased truck. While it is true that Mitchell Hogan agreed to hire only drivers who had been verified by Harris as being qualified on pain of having the contract immediately terminated in the event of a violation, there is nothing in the contract which specifically provides that the hiring of a non-certified driver will be a hiring accomplished *without the permission* of Harris and that is the crucial point.

Permission to operate an insured vehicle may be implied from all the facts and circumstances in a given case and may result by implication from the particular relationship between the parties involved. *Allstate Ins. Co. v. U.S. Fidelity and Guar. Co.,* 663 F.Supp. 548 (W.D.Ark.1987), aff'd *U.S. Fidelity and Guar. Co. v. Cumpton,* 846 F.2d 1147

(8th Cir.1988). Vanliner's policy covers one who is using the truck with the permission of Harris. Since Harris authorized Mitchell Hogan to select operators and did not specifically require that it (Harris) give permission for each and every one of them to drive the leased truck, the Court believes that, during the term of the Equipment Operating Contract, Mitchell Hogan and any driver hired by him would be using the truck with the permission of Harris for purposes of the Vanliner Policy. The undisputed facts show that Ralph Hogan was driving the truck with Mitchell Hogan's permission [Agreed Fact # 2(j) ]. Further, the Agreed Facts indicate that, prior to the trip which culminated in the accident, Harris' dispatcher (Jackie Lewis), knew that Ralph Hogan was operating the truck in question [Agreed Fact # 2(p) ]. Since Lewis was an agent of Harris for the purpose of procuring freight to be transported under Harris' ICC authority by owner/operators under lease to Harris and had handled the paperwork and communications when both Ralph and Mitchell had applied for leases with Harris [Agreed Fact # 2(f) ], it can reasonably be argued that Lewis' knowledge of Ralph Hogan's operation of the truck was and is imputed to Harris. Accordingly, the Court believes the undisputed facts support a finding that Ralph Hogan was operating the truck with the implied permission of Harris at the time of the accident so as to make Ralph Hogan an "insured" under the Vanliner Policy.

7. *Was truck being used "in the business of"*—The second crucial question is whether, at the time of the accident, the truck owned by Mitchell Hogan, leased to Harris and driven by Ralph Hogan was being used "in the business of" Harris. This issue is quite important since it will help determine the coverages of both the Vanliner Policy and the CIC Policy.

The Agreed Facts show that the truck, driven by Ralph Hogan, delivered cargo for Harris and then started back to the home of Mitchell Hogan. It was empty on the trip home and was not under dispatch by Harris or anyone else. The question thus is: On the return trip home, was the truck being used "in the business of" Harris?

This Court is obliged to look to Arkansas law to construe the terms of the insurance policies. *Travelers Insurance Company v. Sindle*, 186 F.Supp. 8, 15 (W.D.Ark.1960). If the terms of the policies are plain and unambiguous, they are to be applied as written without resort to construction techniques. On the other hand, if the provisions are ambiguous, the Court is required to construe them against the interests of the insurer which drafted them. See *Allstate Ins. Co. v. U.S. Fidelity and Guar. Co.*, *supra.* In this case, the Court believes there is no real ambiguity in the language used in the pertinent provisions of the two policies in question. It is clear that the coverage of the both policies depends on whether the truck was being used "in the business of" Harris on the occasion of an accident upon which the various claims are made. The problem comes in when one attempts to apply those provisions to the facts of this case.

In *Sindle*, which also involved a dispute about insurance coverage on a leased vehicle, the Court found that all parties had admitted the tractor involved in the accident was under lease and was being operated "in the business of" the lessee at the time of the accident. *Id.* at 14. The Court also found, as fact, that when the accident occurred, the tractor was "returning from Little Rock, Arkansas, to Kansas City, Missouri, *with a short load of merchandise for delivery to a patron of Stasi* (the lessee) in Kansas City, Missouri." *id.* at 14. (emphasis and parenthetical comment added). Thus, in *Sindle*, the undisputed facts showed (1) that the truck was being used "in the business of" the lessee at the time of the accident; and (2) that this apparently followed because the truck was actually hauling merchandise for the lessee on a return trip and was not returning empty. It, therefore, logically followed in the *Sindle* case that there was no coverage under the trucking insurance coverage by reason of the exclusion which provided there would be no coverage while the truck was being used in the business of any person or organization to whom the truck was rented. In the case at bar, the parties emphatically *do not* agree that the truck was being operated "in the business of" Harris at

the time of the accident and the undisputed facts show that the truck was returning from a delivery empty and *was not* hauling merchandise for Harris. Accordingly, the *Sindle* case does not help much and the Court must look further.

In *Acceptance Ins. Co. v. Canter,* 927 F.2d 1026 (8th Cir.1991), the Eighth Circuit looked at Minnesota law to determine the question of whether a truck was being operated "in the business of" a party. Noting that Minnesota had not explicitly addressed the meaning of "in the business of" in the context of a liability policy issued to a trucker operating under a long-term lease agreement, the Court turned to the law of Minnesota dealing with the issue of "scope of employment." After discussing criteria applied by the Minnesota court in determining whether a trucker had acted within the course and scope of his employment at the time of an accident, the Eighth Circuit essentially applied that same criteria to conclude in *Canter* that the operator of the truck was not "in the business of" the truck's lessee when the accident happened. (driver on way home after completing all dispatched trips and after having waiting at terminal for others which did not occur).

No cases have been cited to this Court indicating that Arkansas courts have explicitly addressed the meaning of "in the business of" in the context of a liability policy issued to a trucker operating under a long-term lease agreement—and the Court's own research has failed to turn up any such. Accordingly, as taught by the *Canter* holding, this Court will look to Arkansas case law for assistance on the matter.

In *Helena Wholesale Grocery Co. v. Bell,* 195 Ark. 435, 112 S.W.2d 416 (1938), the Court held that where the driver of a grocer's truck had delivered groceries and then was allowed by the grocer to go home in the evening and not return until the next day of work, the grocer (employer) was liable for injuries caused by the negligence of the driver while driving the unloaded truck to his home for the night. In so holding, the Court observed:

> We think the jury were warranted, and reasonably so, in drawing the inference from the evidence that appellant's permission to take the truck to the driver's home every night was for the convenience and benefit of said appellant, and that on account of this convenience and benefit the driver was engaged in the prosecution of the business of appellant while driving said truck to his home.

*Id.* at 438, 439, 112 S.W.2d 416.

In *Breeding v. Massey,* 378 F.2d 171 (8th Cir.1967), the Eighth Circuit Court of Appeals observed that Arkansas has adopted the rule that when it is indisputably shown that at the time of a collision, an employee is driving a vehicle owned by an employer, an inference or presumption of fact arises that the employee was acting within the scope of his employment and in furtherance of his master's business. *Id.* at 176, citing *Curtis Circulation Co. v. Henderson,* 232 Ark. 1029, 342 S.W.2d 89 (1961); and *Mullins v. Ritchie Grocer Co.,* 183 Ark. 218, 35 S.W.2d 1010 (1931). The precise nature of the "presumption" was spelled out by the Arkansas Supreme Court in the later case of *Nipper v. Brandon Co.,* 262 Ark. 17, 21, 553 S.W.2d 27 (1977), as follows:

> When a regular employee is driving a vehicle owned by the employer, and an accident occurs, there is a presumption of fact that the employee is acting within the scope of his employment. It is a presumption of fact which imposes on the other party, against whom the presumption is directed, the burden of overcoming this presumption. Ark.Stats.Ann. § 28–1001, Rule 301 (Noncum.Supp., 1976).

\*　　\*　　\*　　\*　　\*　　\*

We feel it necessary to point out that some of the language in our previous cases describing this presumption of fact is not correct. It is not an "inference." *Healey v. Cockrill,* 133 Ark. 327, 202 S.W. 229 (1918). It is not an "inference or presumption of fact." *Curtis Circulation Co. v. Henderson,* 232 Ark. 1029, 342 S.W.2d 89 (1961). It is not a "temporary presumption." *Ford & Son Sanitary Co. v. Ransom,* 213 Ark. 390, 210 S.W.2d 508 (1948). It is not a "prima facie presumption." *Brooks v. Bale Chevrolet Co., Inc.,* 198

Ark. 17, 127 S.W.2d 135 (1939). In other words, we have called this presumption by different names, but the precise description is a presumption of fact as defined in Ark.Stat.Ann. § 28–1001, Rule 301 (Noncum.Supp., 1976).

*Id.* at 21, 553 S.W.2d 27.

In *Kincaid v. Taylor,* 247 Ark. 205, 445 S.W.2d 67 (1969), the Arkansas Supreme Court held the driver of a truck was acting within the scope of his employment where the accident happened as he was on his way home after a workday. After reviewing the facts, the Court there concluded that a jury could have found that the truck was under the employer's control and that the employer received a benefit from the arrangement whereby the employee took the truck home at night. *Id.* at 209, 445 S.W.2d 67, citing *Helena Wholesale Grocery Co. v. Bell, supra.*

The Court first notes, in connection with its review of Arkansas "scope of employment", cases that the issue of "scope of employment" would not have arisen in those cases unless it had first been determined that there was an "employee" involved. In the case at bar, that determination is *not* a prerequisite to the present discussion since the issue is not "scope of employment" but, rather, "in the business of" and the Court is considering cases on the former issue for the purpose of gaining direction or insight with respect to the latter issue.

In this case, the truck in question was required by the lease in question to be in the "exclusive possession, control and use" of Harris and Harris was thereby required to "assume complete responsibility for the operation of the equipment for the duration of the lease" [Agreed Fact # 2(e) ]; at the time of the accident, Harris' logo and ICC permit number were displayed on the truck [Agreed Fact # 2(p) ]; the truck was dispatched by Harris' dispatcher, Lewis, to make a delivery of merchandise for Harris [Agreed Facts # 2(g) and # 2(j) ]; Harris' dispatcher, Lewis, knew before the accident that Ralph Hogan had previously sought to lease his own truck to Harris and to drive for Harris, but was turned down by Harris by reason of his driving record [Agreed Facts # 2(f) and # 2(q) ]; Lewis also knew Ralph Hogan was

driving the truck in question at least one full day before the accident (having driven with him in caravan from Natchitoches, La. to Rogers, Arkansas; having eaten lunch together with him at Y City, Arkansas; and having parked overnight to sleep at the same location on the night before the accident) but never attempted to stop him from doing so nor did he tell anyone else connected with Harris that Ralph Hogan was driving on the trip until after the accident had occurred; [Agreed Facts # 2(j) and # 2(p) ]; the merchandise was delivered as required; [Agreed Fact # 2(j) ]; and the accident happened while the truck, driven by Ralph Hogan, was returning to its point of origin in the company of the other two trucks (one still driven by dispatcher, Lewis) over the same route they had taken on the delivery trip; [Agreed Fact # 2(k) ].

Harris disowned the trip made by Ralph Hogan and neither collected for it from the entity to whom the load on the truck had been delivered nor paid either Ralph Hogan or Mitchell Hogan for any service rendered in connection with its delivery. [Agreed Fact # 2(*l*) ]. Instead, Harris terminated the lease on the truck and terminated its agency relationship with Lewis on April 4, 1995, the day after the accident. [Agreed Fact # 2(r) ].

Using the criteria followed by the Arkansas Courts, this Court believes these facts warrant a finding that the truck was being used "in the business of" Harris at the time of the accident. By contract, the truck was in the exclusive possession and control of Harris. It would seem obvious that once it had been dispatched off to Rogers, Arkansas, or to anywhere else, it would have to leave there at some point so as to be further available to Harris for the purpose of transporting merchandise which—after all—was the primary reason it was under lease in the first place. It certainly would be a benefit and convenience to Harris for the truck *not* to remain at some point where it had last been dispatched but, rather, for it to return to its point of origin so as to be better and more quickly available for future dispatches. While neither the "Logo Liability Rule" nor Arkansas' "presumption of fact" have application on this issue, a persuasive argument could be made that—in company with

them—there should be a strong presumption that a truck under an exclusive lease is "in the business of" the lessee when returning empty from a previous dispatch. That presumption could be refuted, of course, if there were clear evidence to the contrary. There is no such evidence in this case.

8. Having determined that, under the facts of this case, Ralph Hogan was using the truck with the implied permission of Harris at the time of the accident and that the truck was then being used "in the business of" Harris, the Court believes those facts warrant the following answers to the issues described in paragraph three (3) of this opinion:

(a) Does Vanliner have coverage for Harris? *Yes.* This really was not at issue.

(b) Does Vanliner have coverage for Ralph Hogan and/or Mitchell Hogan? *Yes.* The Court believes Ralph Hogan was operating the truck with the implied permission of Harris and thus was covered as an insured under paragraph A1B of the Vanliner Policy's "trucker's endorsement" [Agreed Fact # 2(*o*) ]. The Court further believes that Mitchell Hogan, as the owner of a truck under lease to Harris which was being used "in the business of" Harris, was covered as an insured under paragraph A1C and A1D of the Vanliner Policy's "trucker's endorsement" [Agreed Fact # 2(*o*) ].

(c) Does CIC have coverage for Harris? *No.* This was not really in dispute since no one contended that Harris was insured under the CIC Policy.

(d) Does CIC have coverage for Ralph Hogan and/or Mitchell Hogan? *No.* The CIC Policy excluded coverage while the truck was being used "in the business of anyone to whom the "auto" is rented." [Agreed Fact # 2(m) ] See also Agreed Fact # 2(n).

(e) If both Vanliner and CIC have coverage, which is primary? *Not Applicable.*

9. The Court believes those same facts support the following declarations of fact and law:

(a) As a matter of law, Harris is legally responsible for any damages which may be properly proven in the underlying tort lawsuit as resulting from any negligent operation of the truck owned by Mitchell Hogan,

leased to Harris and driven by Ralph Hogan on April 3, 1995.

(b) As a matter of law, Vanliner is obligated to defend Harris in the underlying tort lawsuit and to pay, to the limits of the Vanliner Policy, any judgment therein awarded against Harris.

(c) As a matter of law, Vanliner is obligated by the Vanliner Policy to defend both Ralph Hogan and Mitchell Hogan against claims advanced against them in the underlying tort lawsuit and to pay, to the limits of the Vanliner Policy, any judgments which may be awarded therein against either or both of them.

(d) As a matter of law, CIC is *not* obligated by the CIC Policy to defend Harris, Mitchell Hogan or Ralph Hogan in the underlying tort lawsuit, nor does it have any obligation to pay any judgments which may be awarded therein against any of them.

IT IS THEREFORE ORDERED that Declaratory Judgment should be, and hereby is, entered as set forth in paragraphs 4, 6, 7, 8 and 9 of this opinion.

IT IS SO ORDERED.