**MIDLAND RISK INSURANCE COMPANY, Plaintiff,**

v.

**Daniel Aaron WHITE, Bob White, d/b/a ABC Auto Sales, Christopher Whitten, Benjamin Whitten, and Jerry Whitten, Defendants.**

**Civil No. 96–6068.**

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Feb. 7, 1997.

Robert M. Honea, Hardin, Dawson & Terry, Fort Smith, AR, for Midland Risk Ins. Co.

Daniel Aaron White, Hot Springs, AR, pro se.

Bob White, Hot Springs, AR, pro se.

Clifton M. Smart, Steve Garner, Strong & Associates, P.C., Springfield, MO, for Christopher Whitten, Benjamin Whitten and Jerry Whitten.

*ORDER*

HENDREN, District Judge.

Now on this 6 day of February, 1997, comes on for consideration the motion for Summary Judgment (Doc. # 7—the "motion") filed herein on November 15, 1996, by separate defendants Christopher Whitten, Benjamin Whitten and Jerry Whitten (hereinafter called the "Whittens" collectively or by their respective names as individuals). Plaintiff has responded and the Court, being well and sufficiently advised, finds and orders as follows with respect to the same:

1. This is a declaratory judgment action brought by plaintiff seeking a judgment that it is not obligated to provide insurance coverage to separate defendant Bob White ("White").

2. In their motion for summary judgment, the Whittens state that there are no genuine issues of material fact and that, as a matter of law, plaintiff is obligated to provide coverage pursuant to the insurance policy it issued to White.

Plaintiff purports to agree that there are no genuine issues of material fact to be decided but, in contrast to the position of Whittens, contends that those same facts entitle it—vice Whittens—to summary judgment declaring that, as a matter of law, plaintiff is *not* obligated to provide coverage under the policy in question.

3. The material facts which the parties appear to agree are not in dispute are as follows:

(a) On or about March 2, 1991, a collision occurred in Oregon County Missouri, between a Camaro automobile (Camaro) being operated by separate defendant Daniel Aaron White ("Daniel White") and an automobile being operated by Martha Whitten.

(b) As a result on the collision, Martha Whitten and Joel Whitten, her son, were killed, and separate defendant Christopher Whitten, another son, was injured.

(c) Daniel White was found guilty of involuntary manslaughter for the deaths of Joel Whitten, on October 22, 1993, and Martha Whitten, on October 20, 1995, in the Missouri Circuit Court of Carter County, Missouri.

(d) Defendant Christopher Whitten has filed suit against Daniel White and White (Daniel White's father) for his own injuries, and defendants Christopher Whitten, Benjamin Whitten and Jerry Whitten have filed suit against the same parties for the wrongful deaths of Martha Whitten and Joel Whitten. This suit is pending in the Circuit Court of Oregon County, Missouri.

(e) On or about January 6, 1991, plaintiff issued an insurance policy to defendant White, d/b/a ABC Auto Sales. The policy was a garage keeper's automobile liability insurance policy, numbered GL–1866 (the "policy"), with limits of liability of $100,00.00 per person, and $100,000.00 in the aggregate, per occurrence. This policy was in force at the time of the accident.

(f) The policy provided, in pertinent part, as follows:

(1) that coverage would be provided to the insured "for all sums which the insured shall become legally obligated to pay as damages because of [G.] bodily injury" ... "caused by an occurrence and arising out of garage operations" as follows:

IV. PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

A. Under the Garage Bodily Injury and property Damage Liability Coverages:

\* \* \* \* \* \*

(3) with respect to the automobile hazard:

(a) any person while using, with the permission of the named insured, any automobile to which the insurance applies under the automobile hazard, provided his actual operation or (if he is not

operating) his other actual use thereof is within the scope of such permission.

(2) The policy also featured the following "additional definitions":

## VI. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"automobile hazard" means that one of the following hazards for which insurance is afforded as indicated in the schedule:

Automobile Hazard 1—(1) the ownership, maintenance or use (including loading or unloading) of any automobile for purpose of garage operations, and

(2) the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations, and

(3) the ownership, maintenance or use of any automobile owned by the named insured while furnished for the use of any person.

(3) The policy also featured a "Furnished Automobiles Exclusion" as a part of its Garage Liability Master Endorsement (Hazard I) which states:

It is hereby agreed and understood that Bodily Injury and Property Damage coverage for those Automobiles owned by the Named Insured and furnished for the regular use of Owners, Partners, Executive Officers, Employees, spouses, children or relatives of the foregoing; or any other person or organization is limited to the following scheduled persons or organizations and the drivers listed below:

(4) The only name "listed below" pursuant to the said "Furnished Automobiles Exclusion" is: Bob White.

(g) White purchased the Camaro—a few days before March 2, 1991—for the purpose of resale in the regular course of his business.

(h) White has testified, under oath, that he did not furnish the Camaro for Daniel White's regular use.

(i) Daniel White has testified, under oath, that every time he drove the Camaro from the date White purchased it until the date of the accident (March 2, 1991) he did so with White's permission.

(j) On March 2, 1991, White had authorized Daniel White to take the Camaro and show it to a prospective purchaser.

(k) In a statement given under oath on March 19, 1991—some seventeen days after the accident in question—White stated:

(1) In a response to questions concerning the Camaro:

. . . Now, when I bought the car, I bought it to be never have been worked on. (sic) And, when we got it home and started cleaning it up, it looked like it might have been worked on. I relayed the message to the auction that *I was figuring on bringing the car back* because it showed signs of prior body work. They said if that was the case, the way I had bought, that I had the right to bring it back, and *that was our intention.* (Emphasis added)

Q: Was to take it back?

A: Yeah.

(2) In a response concerning the alleged sale of the Camaro to Daniel White:

. . . Daniel had talked to me that afternoon about—oh maybe an hour and half before the wreck, and said, "Dad, I would like to buy this car—I like it a lot. I'd like to put it on payments." And I said, "we'll have to check how much the insurance and the payments would be and *find out on Monday*". . . (emphasis added)

(3) In a response as to who owned the Camaro at the time of the accident:

Q: But at the time the accident happened, it was your car?

A: *It was still my car.* (Emphasis added).

(1) In a deposition given under oath on March 30, 1994—over three (3) years after the accident in question—White stated:

(1) In response to questions about his verbal sale of the Camaro to Daniel White on March 2, 1991:

. . . He had shown the vehicle to a girl who was interested in buying it, he worked some with me, and he said, "Dad, I would

like to get this vehicle for myself, if I could." I said, "Well, I'll trade you—take your little car in and we'll figure out something. We'll call the insurance in on Monday" that was on a Saturday, "We'll get your insurance taken care of on Monday and then whenever the title comes in, we'll get a loan on it."

Q: Now, your son verbally purchased that vehicle that day from you. How did he purchase it? I know you said verbally, but, I mean, did he give you any monies?

A: No. He was just sitting in that car and my wife and I were coming from shopping, and we just pulled along side of him.

(2) In further response to questions about his verbal sale of the Camaro to Daniel White on March 2, 1991:

Q. Mr. White, your son, Daniel, *was going to purchase this vehicle from you?*

A. *Yes.*

Q: What was your *selling price* from this vehicle?

A: *I would have probably let him just have it and traded his car in, but we didn't actually ...*

Q: *Have a chance to discuss that*

A: *We didn't, no.* (Emphasis added)

(m) In a deposition given under oath on July 14, 1995—over four (4) years after the accident in question—White stated:

(1) In response to questions about his verbal sale of the Camaro to Daniel White on March 2, 1991:

... I said: "Well, what did the girl say about the car?" And he said, "Her mother doesn't know if she would be able to afford the insurance or whatever. She will check up on it." And he said, "I would really like to have this car." ... I said, "Well, then, I'll give you a couple hundred on your old car and the bank money. We'll go get a loan. I'll call in the insurance, and *I'll let you go ahead and buy it then.*" (Emphasis added)

Q: So basically he was a *potential customer at that point in time?* (Emphasis added)

A: *Yeah.* (Emphasis added)

\* \* \* \* \* \*

Q: So he was certainly driving the car with your permission—

A: Yes.

Q: —on the day of this wreck?

A: Yes sir.

Q: And *in your mind, might have pretty well just bought the car from you:* (Emphasis added)

A: Yes sir.

(n) In a statement given under oath on March 19, 1991—some seventeen days after the accident in question—Daniel White stated:

(1) In a response to questions concerning the ownership of the Camaro on the date of the accident:

Q: And you were involved in an accident on March 2, 1991. *And who's car was it that you were driving?* (Emphasis added)

A: *My Dad's.*

\* \* \* \* \* \*

Q: And for what purpose were you using the car?

A: *I was—well, I was thinking about buying it.* (Emphasis added)

\* \* \* \* \* \*

Q: The car you were driving, *you say that was your dad's car? Was it part of the inventory—part of the inventory?* (Emphasis added)

A: *Yes.* (Emphasis added)

Q: And was the car registered?

A: No. I bought it on Tuesday in Little Rock, Arkansas.

Q: So you had just bought the car, and—it was part of your inventory?

A: Yes.

Q: And course (sic) the draft was written on your ABC Auto Sales? And did you have a car of your own?

A: Yes sir.

Q: And what kind of car was that?

A: A Dodge Charger 2.2; an '83 model.

Q: Inoperable?

A: Yeah, it hadn't been run for awhile. It used about 3 quarts of oil a day—.

Q: So there was something wrong with the engine and you were not driving it for that reason? Is that what you are saying?

A: Yes, it had some stuff messed up on it, and I couldn't drive it.

Q: And who was—you had insurance coverage on this other car—on the Charger?

A: Yes sir.

Q: All right, and who was that through?

A: White River.

Q: White River Agency in Calico Rock—or rather Salem? Tulsa General?

A: That's who I made my payments to, but that was—

Q: West General? Yeah, I believe that is what you told me on the telephone.

Q: And you had both collision and liability?

A: No, just liability.

Q: Just liability only? Okay.

(o) In a deposition given under oath on May 31, 1995—over four (4) years after the accident in question—Daniel White stated:

(1) In response to questions about his verbal purchase of the Camaro from White on March 2, 1991:

Q: If I recall the question, it was, did at some point you reach an agreement with your father to buy the Camaro?

A: Yes.

Q: And when was that?

A: That was Saturday evening.

Q: When you say evening, what time do you mean?

A: Around three.

Q: Okay. And what agreement did you reach with your father?

A: The agreement was to—he would pay for the insurance, finance me the car. I believe he was to finance me the car or get me a loan. I really can't remember. And I would pay him for that.

Q: And were you going to keep the—the—you owned the Charger at this time, is that correct?

A: Yes.

Q: And were you going to keep the Charger?

A: No.

Q: Was that part of the—the agreement with your father?

A: Yeah. Yes. That was part of the trade-in.

Q: Okay. You were going to trade in your car to your father?

A: Right.

Q: Where were you, at the time when you and your father discussed this at 3 p.m. on—on Saturday?

A: I was at Pump 'N Pantry Conoco.

\* \* \* \* \* \*

Q: And you said that, at about 3 that afternoon, you met your parents at the Pump 'N Pantry there in Thayer?

A: Correct.

Q: And that's when you reached an agreement with your father to purchase the car?

A: Correct.

Q: Now, when you showed Carla Buehler the Camaro—strike that. Did you show Carla Buehler the Camaro that day?

A: Yes.

\* \* \* \* \* \*

Q: Okay. And you—I believe you stated earlier that you showed the car to them (Carla Buehler and her mother, Pat Buehler) around 3:30 to 4?

A: Yeah. Closer to 4.

Q: Was this *after* you talked to your parents about buying the car? (Emphasis added)

A: *Yes.* (Emphasis added)

Q: Why did you show it to her, if you'd already decided to buy the car?

A: Well, the—the reason of it was, was because if—if I could sell a car *for my dad,* I can make profit off that. We had made that agreement. (Emphasis added)

Q: So, you were still—so, even though *you had talked to your dad about buying the car,* you showed it to Carla, because you could still—you still might sell the car? (Emphasis added)

A: *Correct.* (Emphasis added)

(p) White and Daniel White both have testified, under oath:

(1) that, on the date of the accident, March 2, 1991, Daniel White was employed by his father, White, at ABC Auto Sales.

(2) that, as an employee, Daniel White sometimes drove automobiles owned by White but only with the latter's permission and only in connection with the business.

(3) that White did not furnish Daniel White with a car off the lot for Daniel White's personal use.

(4) that on March 2, 1991, Daniel White was driving the Camaro with White's permission and knowledge.

(q) The automobile driven by Daniel White at the time of the accident was originally purchased by White at a wholesale auction on February 26, 1991, with the intent to resale the car for profit—as this was in the ordinary course of his used-car business.

(r) The accident report for the March 2, 1991, accident identifies "ABC Auto Sales" as the owner of the vehicle—information presumably supplied by one or both of the Whites;[1] and

(s) White sought and obtained reimbursement from plaintiff for the property damage to the vehicle as a result of the wreck under the underinsured motorists provision of the policy.[2]

4. Plaintiff contends in the present action that there was no coverage for the automobile at the time of the accident because White was no longer the owner of the car. This argument is based upon an alleged sale of the car by White to his son, Daniel White, prior to the accident. Alternatively, plaintiff argues that even if White was the owner of the car at the time of the accident, it is still not obligated to provide coverage because Daniel White's regular use of the car while not being listed as a scheduled driver, activates a policy exclusion. The Whittens deny these contentions by plaintiff.

5. In the motion now under discussion, the Whittens argue they are entitled to summary judgment that coverage is available to White. They say that, as matter of law, White was the owner of the car Daniel White was driving at the time of the accident and the car was not furnished for Daniel White's regular use.

The Whittens further say the undisputed facts clearly show that, within the terms of the policy, Daniel White was insured as a permissive user of the car and, pursuant to the policy, was using the automobile within the scope of White's permission. Finally, they say that the facts of the case fail to show that coverage should be denied due to a policy exclusion or exception.

The Whittens go on to state that the undisputed facts show that White allowed Daniel White to operate the car only with his permission for business purposes on rare occasions and although Daniel White and White had discussed Daniel's purchase of the car shortly before the wreck, the sale was never completed and White was the legal owner of the car at the time of the accident. They claim that this fact is evidenced by the plaintiff's payment of White's property damage claim under the underinsured motorist provision of the policy.

6. Plaintiff contends that White and Daniel White reached an agreement prior to the accident pursuant to which White sold, and Daniel White purchased, the car in question. Plaintiff states that, while no money changed hands and the transaction was never documented in any fashion, both White and Daniel White have stated that they considered it a consummated sale.

Plaintiff concludes that due to this "transaction", it is not obligated to provide coverage pursuant to the insurance policy because the automobile had been sold prior to the accident and therefore was no longer included within the coverage of the policy. In the alternative, plaintiff states that the coverage for Daniel White was excluded as he was not listed in the furnished automobiles endorsement but the vehicle was provided for his regular use.

---

**1.** Exhibit "A" to Doc. # 18.

**2.** Deposition of Bob White, at 114 and 117.

7. Summary judgment is appropriate where it is "show[n] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. "When a motion for summary judgment is made and supported as provided in (Rule 56), an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in (Rule 56), must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

The United States Supreme Court has articulated guidelines for application of Rule 56, stating that "the plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, "there could be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

Therefore, once a motion for summary judgment reveals the non-movant's complete failure of proof regarding an essential element of their case, the burden shifts to the non-movant to offer "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture or fantasy." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993), *quoting Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985). The "mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989). If the non-movant fails to demonstrate the existence of a genuine issue of material fact by offering significant probative evidence, the defendant is entitled to summary judgment as a matter of law. *Pentel v. City of Mendota Heights*, 13 F.3d 1261, 1263 (8th Cir.1994).

8. As argued by the Whittens, Arkansas law governs the interpretation of the terms of plaintiff's insurance policy with White, d/b/a ABC Auto Sales. *See Connecticut Indem. Co. v. Harris Transport Co.*, 909 F.Supp. 1212, 1221 (W.D.Ark.1995), *citing Travelers Ins. Co. v. Sindle*, 186 F.Supp. 8, 15 (W.D.Ark.1960). Their argument that, where an insurer claims that it is not liable on a policy because of some exception or exclusion, the "burden is on the insurance company to prove facts that bring it within the exception or exclusion" is also sound. *Eagle Star Ins. Co. v. Deal*, 337 F.Supp. 1264 (W.D.Ark.1972).

The Whittens insist that not only can plaintiff not show any disputed facts which, if resolved in its favor, would allow it to escape coverage under an applicable exception or exclusion under its policy, the material facts which are not in dispute clearly show that no such exception or exclusion applies. Accordingly, say Whittens, they are entitled to summary judgment in their favor.

9. Plaintiff responds by arguing that "both father and son are adamant that they had a deal, and that a sale had been consummated." Plaintiff then concludes, "[i]t follows that since the parties involved agree a sale occurred, then a transfer of ownership also occurred" and "[t]he conclusion is therefore inescapable that Daniel White was in fact the owner of the vehicle at the time of the accident, that Bob White was not, and that the Plaintiff is not obligated to provide coverage pursuant to its policy of insurance." "At a minimum", says plaintiff, "a genuine issue of fact exists which can only be resolved by the trier of fact."

10. The parties seem to agree that the case of *United States Fidelity & Guaranty Co. v. Downs*, 230 Ark. 77, 320 S.W.2d 765 (1959) is instructive in this case. The Court agrees.

*Downs* involved two brothers—J. P. Downs and W.F. Downs (hereinafter called J.P. and W.F., respectively). J.P. had bought a truck/trailer rig and insured it. He thereafter gave possession and use of it to W.F. for use in W.F.'s business, telling his brother that they would "settle for it" after J.P. had repaid the loan. *Id.* at 766–67. More than a year later, while W.F. was using the truck/trailer more or less all the time, one of W.F.'s employees was driving it when it collided with a car. *Id.* at 766. The insurer who had issued the policy to J.P. on the truck/trailer denied coverage for the accident on the ground that the truck/trailer had been sold to W.F. prior to the wreck. *Id.*

Upholding the trial court's finding that the truck/trailer had not been sold but were covered under the insurance policy, the Arkansas Supreme Court relied on facts similar to those in the present action: (1) the rig was registered and titled in the J.P.'s business name; (2) no purchase money was paid by W.F. to J.P. at any time; and (3) J.P. had reported to his insurer property damage to the rick when the accident happened. *Id.* at 767–68.

In the case at bar, plaintiff's assertions concerning a sale rest on the statements of White and Daniel White. It is, therefore, useful to carefully consider those statements.

(a) When White was interviewed, under oath, only seventeen (17) days after the accident, he said that he had talked to Daniel White about a sale on the Saturday of the accident but indicated they would have to "check how much the insurance and payments would be and find out on Monday". He went on to say, however, that at the time the accident happened, "It (the Camaro) was still my car." White did not then mention that, before the accident, he intended to sell, or thought he had already sold, the Camaro to Daniel White. White *did* then clearly state that he intended, before the accident, to return to car to the party from whom he had purchased it since he had discovered that it had been previously "worked on" in contravention of the terms under which he had initially purchased it. There would seem to be little question or confusion about the matter of the ownership of the Camaro in White's mind at that time which was shortly after the event.

(b) When Daniel White was interviewed, under oath, only seventeen (17) days after the accident, he clearly said the Camaro was "My Dad's" when asked "who's car was it that you were driving?" He went on to say that he was then "thinking about buying it" but again affirmed that the Camaro belong to White by answering "Yes" to the question: "... you say that was your dad's car?" Daniel White did not then mention that he clearly intended to buy the Camaro before the accident or that he thought he had. There would seem to be little question or confusion about the matter of the ownership of the Camaro in Daniel White's mind shortly after the event.

(c) On March 30, 1994—Three (3) years after giving his first sworn statement back on March 19, 1991—White said that Daniel White had verbally purchased the Camaro from him on the day of the accident—but *before* the accident had happened. White said then that the verbal purchase took place *after* Daniel White had shown the Camaro to Carla Buehler in an unsuccessful attempt to sell the car to her.

(d) On July 14, 1995—almost four (4) years after he had given the March 19, 1991, statement—White admitted that Daniel White was a "potential customer" before the accident but that, in his mind, he "might have pretty well just bought the car" from him at that time.

(e) On May 31, 1995—over four (4) years after giving the sworn statement on March 19, 1991—Daniel White said that he had reached an agreement with White on the day of the accident (but before it happened) to buy the Camaro. However, Daniel White said that the agreement was reached *before* he showed the car to Carla Buehler and was pressed hard by the attorney as to why he would have still tried to sell the car after he had just bought it. In trying to explain, Daniel White said "Well, the—reason of it was, was because if—if I could sell a car *for my dad,* I can make profit off that. We had made that agreement." (Emphasis added).

■ Plaintiff's argument that the "intentions" of White and Daniel White are sufficient to establish a sale is not persuasive. First, the Court doesn't believe that the statements of the Whites—taken as a whole—even clearly establish such an intention. Certainly their statements made only a few days after the event—when it would appear that their recollections would be most sharp—would admit no such conclusion.

Further, even if the statements could be regarded as having clearly expressed an intention to make a sale, it can hardly be said that intentions alone are enough to establish the fact of a contract. It will be recalled that White said, in his first statement, that it was his *intention* to return the Camaro to the person from whom he purchased it. Could it be reasonably argued that such an intention was sufficient to have actually returned the Camaro to the former owner with the result that the former owner would have been the owner of the Camaro at the time of the accident? Clearly no such argument would be reasonable or availing.

The Court is also very troubled about the inconsistencies between the deposition testimonies of White and Daniel White about the so-called verbal sale. They agree that no money changed hands and that no firm price was established. They also seem to agree that several contingent matters had to be explored (insurance, financing, etc.) before the deal could be completed—on the following Monday. However, they apparently disagree as to when Daniel White attempted to sell the car to Carla Buehler. In the Court's view, White's view on this point is probably the correct' one since it would seem to be more logical. However, if Daniel White's version is correct, it simply seems to support the notion that he was then just a *potential* purchaser of the Camaro and he was still trying to sell the car *for his dad* even after he had allegedly "verbally purchased" it.

The Court notes that the Camaro was never titled in Daniel White's name; he never sought or received insurance coverage on it; and he never paid any money or gave any other consideration for it. On the other hand, the car clearly *did* belong to White unless he, in fact, returned it to the former owner pursuant to his intention or he, in fact, sold it to Daniel White pursuant to his intention—neither of which, in the Court's view, happened; White filed a claim on the Camaro with plaintiff; and the accident report showed the car as belonging to White.

In the Court's view, the evidence available would not support a finding, by a preponderance of the evidence, that the Camaro was sold to Daniel White prior to the accident or that it was owned by him at the time of the accident. On the other hand, the Court believes the evidence clearly would support a finding that the car was owned—at all relevant times—by White.

It follows that, since Whitten have pointed out the lack of proof to establish that the Camaro was not owned by White at the time of the accident, plaintiff has the burden of meeting proof with proof and establishing the existence of a material fact question on the ownership issue. The Court does not believe plaintiff has been able to do so.

11. In an effort to draw a distinction between the facts of this case and those of *Downs,* plaintiff argues that in *Downs,* J.P. manifested a degree of ownership following the agreement with W.F. and that White did no such thing here. The Court disagrees that there is any such distinction. The testimony of Daniel White seems to clearly indicate that—right up to the time of the accident and after his alleged verbal purchase of the Camaro—both he and his father still believed the Camaro to belong to White and to be for sale to Carla Buehler or anyone else. Also in this case is the fact that White apparently manifested some degree of ownership of the Camaro after the alleged sale by filing a claim for damage to the car and receiving payment for such.

■ Plaintiff attempts to explain the matter of the claim by saying that although White had sold the vehicle, it nevertheless chose to pay the claim because:

\* its insured, White, had at least some interest in the vehicle, in the nature of a purchase money security interest;

* given the amount of money involved, the Plaintiff did not consider it economically justifiable to litigate the issue;

* the Plaintiff chose to give its named insured the benefit of the doubt as to this claim; and,

* White had purchased UMPD coverage, and the vehicle was damaged by an uninsured motorist, Daniel White.

Plaintiff concludes the argument by saying that "the fact that the Plaintiff paid Bob White for the property damage to the Camaro is not relevant in regard to the question of whether Bob White did or did not own the vehicle at the time of the accident." *See* Plaintiff's Response, page 9.

The Court is not persuaded by plaintiff's arguments and is not inclined to accept the notion that an insurance company's payment of a claim on an automobile insurance policy in any way partakes of benevolence. The Court believes that plaintiff's payment to White is quite relevant to the ownership issue and, taken together with the other evidence tending to establish that White was the owner of the vehicle, lends support to the Court's conclusion as to that issue.

Accordingly, summary judgment can be properly awarded in favor of the Whittens that White was the owner of the vehicle in question so as to warrant coverage of the same under the policy of insurance issued by plaintiff to White, and it will be so ordered.

12. Plaintiff also argues in defense of the Whittens' motion for summary judgment that, even if Bob White was the owner of the vehicle, it is still not obligated to provide coverage to White due to the policy's exclusion of coverage for any vehicle owned by White but furnished to another person for the regular use when such person is not listed as a scheduled driver.

It appears that plaintiff's reliance on this second theory for denying coverage is based upon its contention that Daniel White was

the owner of the Camaro pursuant to the alleged verbal sale him and his father. Plaintiff says in its response, "[t]his case presents a situation in which the dealership *sold* the car to the employee. Obviously, once a car has been sold, it is available for the 'regular use' of the new owner." *See* plaintiff's response, page 10. Plaintiff then concludes, ". . . a fact issue is created as to whether the end result of the conversation of March 2, 1991, was sufficient to give Daniel White the 'regular use' of the Camaro." *Id.* at 11.

Since the Court has concluded that White owned the Camaro and had not sold it to Daniel White, the argument has no legs. Beyond that, however, is the fact that both White and Daniel White have indicated that the Camaro had not been provided to Daniel White for his regular use, as evidenced by the following excerpts from the deposition testimony of White and Daniel White:

On March 2, 1991, Dan White owned a 1983 Dodge Charger for his own personal use and was not furnished any car—including the Camaro—from the used car lot for his own personal use.[3] Although Dan White would sometimes drive automobiles owned by his father (d/b/a ABC Auto Sales), he only did so with his fathers permission and usually for a business-related purpose.[4] The Camaro driven by Dan White on the day of the wreck had been purchased by Bob White only four days before and the two or three times Dan operated the Camaro during that time were with his father's permission and for business purposes.[5] In fact, Bob White had given Dan permission to use the Camaro on March 2, 1991, in order to show the car to someone for its possible sale.[6]

*See* Whittens' Motion for Summary Judgment, page 9.

Plaintiff offers no proof to dispute these facts beyond the continued argument that the alleged "sale" makes Daniel White the

---

**3.** Deposition of Bob White, at pages 30, 31, and 37; Deposition of Daniel White at pages 19, 68 and 13.

**4.** *Id.*

**5.** Deposition of Bob White, at 74, 75 and 93; and Deposition of Daniel White, at 62, 63, 64 and 88.

**6.** Deposition of Bob White, at 115; and Deposition of Daniel White, at 97 and 98.

regular user. Since the Court has already determined that no such sale took place, it cannot be said that plaintiff has met its burden of showing the existence of a fact issue on this point.

Because plaintiff has the burden of establishing facts which would call for denial of coverage due to a policy exception or exclusion and it "has completely failed to prove this essential element of its case," summary judgment is proper on the issue. *See, Celotex,* 477 U.S. at 322, 106 S.Ct. at 2548.

Accordingly, summary judgment can be properly awarded in favor of the Whittens in that Daniel Whitten was *not* the regular user of the vehicle in question so as to exclude the vehicle from coverage under the policy of insurance issued by plaintiff to Bob White and it will be so ordered.

IT IS, THEREFORE, ORDERED that defendant's Motion for Summary Judgment be, and it hereby is, granted;

IT IS FURTHER ORDERED AND DECLARED that, as a matter of law, Bob White was the owner of the vehicle in question (the Camaro) at the time of the accident of March 2, 1991; and that he had not theretofore sold the same to his son, Daniel White;

IT IS FURTHER ORDERED AND DECLARED that, as a matter of law, coverage of the vehicle in question (the Camaro) is not excluded under the policy by reason of the "regular use" exclusion since the facts do not show that said vehicle was being provided to Daniel White for his regular use at the time of the accident in question so as to activate said exclusion;

IT IS THEREFORE ORDERED AND DECLARED that, pursuant to the terms of the policy in question, plaintiff has the obligation to defend and otherwise provide coverage for Bob White and Daniel White—within the terms and provisions of said policy as construed by this order—in connection with litigation arising out of the accident in question which occurred on or about March 2, 1991.

IT IS FURTHER ORDERED that a judgment reflecting the basic conclusions of this order will be entered contemporaneously herewith.

IT IS SO ORDERED on the date first hereinabove written.